Filed 7/19/16  P. v. Lee CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C079734 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F00811) |
| v. | |
| WEBSTER LEE, | |
| Defendant and Appellant. | |

On February 3, 2014, defendant Webster Lee, suffering from bipolar I disorder and in a manic phase, went on a crime spree.  He forced a woman at gunpoint to tie up his wife; he then beat his own wife for hours.  He shot two people, threatened others at gunpoint, carjacked one vehicle and stole another, and violently resisted arrest.  A jury found him guilty of 15 felonies, with multiple firearm and great bodily injury enhancements, and then found him legally sane at the time of the shootings.  The trial court sentenced defendant to a determinate term of 30 years in state prison plus an indeterminate term of 25 years to life.

1

On appeal, defendant contends it was error to admit his wife's testimony at the preliminary hearing because the People failed to exercise reasonable diligence in obtaining her presence at trial. He contends there was insufficient evidence to support a conviction of violent resisting because an officer first used unlawful force against him, shooting him when he was unarmed. Defendant claims his sentences on count 8 (false imprisonment) and count 15 (felon in possession of a firearm) must be stayed because these offenses were part of an indivisible course of conduct. He argues there was insufficient evidence to support the finding that he was legally sane as the jury could not reasonably reject the evidence of his insanity. Finally, defendant requests a correction to the abstract of judgment regarding the (stayed) sentence on count 12, to which the People agree.

We order the abstract of judgment corrected and affirm.

### FACTS

*Defendant's Various Relationships*

Defendant has been married to Cynthia Lee since 1995; they have a teenage daughter named Deaja.[1] They lived in an apartment at 2390 Oakmont. Defendant also had a girlfriend, Tanyia Harris. Cynthia knew of this relationship and had no problems with it. At times, all four of them--defendant, Cynthia, Deaja, and Harris--lived together.

Cynthia's friend, John Anderson, lived in the apartment upstairs. (RT 296, 552) Anderson lived with his daughter Regine; Regine's friend, Iesha Fisher; and Fisher's young daughter. Fisher was Cynthia's sister. Anderson's son Christopher was the father of Fisher's child; he was defendant's neighbor as well as Anderson's, living in a duplex behind the apartments. Christopher looked to defendant as an uncle.

---

[1] Because many of the people we discuss share the same last name, we will at times refer to them by first name.

*Defendant's Behavior Preceding the Crimes*

In the days before the shooting, defendant was not sleeping or eating and smelled bad. He was very talkative, made little sense, and appeared to be "foaming at the mouth." He was watching "stress movies" and kept saying they (his family) were immortal, meaning they were invincible. Harris (his girlfriend) told the police that defendant was having a mental breakdown; Cynthia (his wife) thought he was an "emotional wreck."

The night before the shooting, defendant called Harris and told her Cynthia was "lost" and asked for help finding her. Harris told him Cynthia was out doing someone's hair. The next morning Harris went to defendant's residence and found Cynthia there asleep which "kind of threw [Harris] a bit" because defendant had been acting like Cynthia was still missing.

Later that day defendant wanted to watch a movie that was a "little satanic" about the Illuminati. During the movie, the power went out twice and each time defendant went outside to the breaker box. He was angry, loud, and obnoxious and said someone was "messing" with the power. He said Christopher (his neighbor and quasi-nephew) was outside by the breaker box.

*The Shootings and Assaults*

Defendant was crying and emotional. He wanted Cynthia, Deaja (his teenage daughter), and Harris to sit on his lap and say they all loved each other. Harris and Deaja did so, but Cynthia would not and wiggled out of the hug. Cynthia said, "[T]his ain't no love." Defendant got angry and told Cynthia she must be "one of them." He was talking about people who he perceived to be after him.

Defendant got a shotgun from Deaja's room and pointed it at Harris. He told Harris to tie Cynthia up. Defendant told her she must be "one of them" if she did not do it. He threatened to shoot Harris if she did not tie up Cynthia. He held Cynthia down while Harris tied her up.

3

Defendant then assaulted Cynthia. He banged her head on the ground, hit and kicked her in the ribcage, and burned cigarettes on her leg. He choked her three times. The assault lasted for hours. During the assault defendant was sweating and crying and looked "destroyed." Cynthia described defendant as "acting fucking retarded."

Harris recalled being in the bathroom after the assault. Defendant barged in and picked up the gun which was then in the bathroom. Defendant pointed the gun at Harris and told her "you must be one of them." Later, Harris went in the kitchen and picked up a knife. Defendant told her to put it down and she threw it in the sink. Harris stepped towards defendant and he shot her in the shoulder. Defendant said he was going to jail.

Defendant went upstairs to John Anderson's apartment. He had a gun and demanded keys to a Ford Explorer, threatening that he would shoot people. Defendant was pointing the gun at Anderson, Regine (Anderson's daughter), and Fisher (Cynthia's sister). Defendant said if the car did not work, he would kill everyone. Fisher handed the keys to Regine who gave them to Anderson who handed them to defendant.

From the window Fisher saw defendant shoot someone in the alley. She heard more than one shot. Christopher (Anderson's son) was in the alley, bleeding. Police later found a trail of shotgun shells and blood outside the apartment. Christopher was treated for shotgun injuries to his left side and a collapsed lung. He had shotgun pellets in his kidney and near his spine. He spent 10 days in the hospital.

Defendant told Harris (whom he had shot in the shoulder earlier) that he would take her to the hospital. Deaja and Cynthia got in the back seat of Fisher's truck; defendant and Harris got in the front. Defendant still had the shotgun, but once on the freeway he said he needed another gun. Defendant kept driving, passing several hospitals; he said he did not trust Sacramento hospitals. Harris wanted out of the car and undid her seat belt, but defendant put it back on. When he stopped for gas, none of the women got out. Finally, defendant stopped in Concord and Cynthia and Harris got out. Cynthia put the gun in a trash can. They went to a church where a man called an

4

ambulance. Defendant drove off with Deaja. The police later found the shotgun in a recycling bin.

Cynthia was seen in the emergency room, presenting with the complaint of assault. She changed her story as to who assaulted her, but was consistent that the assault consisted of choking, brief loss of consciousness, being thrown to the ground and kicked in the ribs. She had a significant headache and neck and chest pain. She had multiple visible injuries, two inches of hair missing, and her left face and eye were bruised and swollen. She had bruises and scratches on her neck and body. Harris had three surgeries on her arm and at the time of trial still could not put weight on it.

*The Stolen Car and Violent Resisting*

Michele Latteri owned a white Ford Ranger with "Fleet Pride" on the side. That day she stopped at Don's Market, grabbed her ATM card and went inside, leaving her keys in the truck. When she returned, the truck was gone. Latteri had left her iPhone in her truck. Using the "find my phone" function, the police determined the phone was traveling north on Highway 680 and then east on Interstate 80.

California Highway Patrol Officers Scott Lander and Paul Willet were on duty that day out of the Fairfield office, patrolling near Interstate 80 in separate cars. After 7:00 p.m. they received a be-on-the-lookout report for an armed and dangerous suspect driving a white Ford ranger with "Fleet Pride" on the side. The report indicated that the driver was possibly involved in a domestic violence home invasion with shots fired and someone shot, the suspect was possibly armed with a sawed-off shotgun, and the truck was stolen.

Willet saw the truck go past on Interstate 80 at 90 to 100 miles per hour; he contacted dispatch and followed. Defendant was driving the truck. Lander entered the freeway behind Willet and radioed him. The officers conducted a vehicle stop and the white truck stopped on the shoulder near Pedrick Road. The officers got out of their cars. Lander ordered the defendant to put his hands up while he was still inside the truck.

5

Defendant did so for a few moments, then lowered his arms and reached to the passenger side of the truck. Defendant appeared to be digging for something.

Suddenly the truck door opened and defendant jumped out and charged the officers. His movement was sudden and aggressive. Lander shot defendant once and defendant immediately fell to the ground. Willet notified dispatch that shots were fired and called for an ambulance. Defendant fell partially in the road and the officers dragged him to the shoulder. They found no gun on defendant or in the truck. While the officers were attempting to assess defendant's injuries, defendant went "violent crazy," kicking and grabbing at Willet, near where his gun was holstered. Defendant kicked Willet, knocking him down. When Willet held defendant down, defendant tried to bite him.

The police found Deaja and Fisher's Ford Explorer in Concord.

*Psychiatric Testimony*

The court had appointed psychiatrist Charles Schaffer to evaluate defendant. Schaffer had been a psychiatrist for about 35 years and had performed 2,500 to 3,000 forensic examinations. He reviewed the police report, defendant's criminal history,[2] the testimony of Harris and Cynthia at the preliminary hearing, the jail psychiatric records, medical records, psychiatric records from Elmhurst Hospital in New York,[3] Cynthia's statement to a defense investigator, and two interviews with defendant.

Schaffer testified that on the day of the crimes defendant was suffering from bipolar I disorder with a recent manic episode with psychotic features. Psychotic meant defendant had hallucinations, delusions, and disorganization. His manic phase symptoms included disturbance of mood and effect, rapid speech, psychomotor agitation,

---

[2] The parties stipulated defendant had two felony convictions: possession of marijuana for sale and possession of a controlled substance for sale.

[3] In 2011, defendant was hospitalized at Elmhurst Hospital in New York and diagnosed with psychotic disorder not otherwise specified (NOS).

6

inappropriate behavior, insomnia, loss of appetite, paranoid delusions, thought disorganization, impaired concentration and attention, and impaired higher brain functions such as judgment. Schaffer opined, to a reasonable degree of medical certainty, that defendant's paranoid delusion was the major contributing factor to the shooting of the two victims.

Schaffer also diagnosed defendant with cannabis use disorder and anti-social personality disorder.

*The Verdicts*

The jury found defendant guilty of attempted murder (Pen. Code, § 664/187, subd. (a))[4] of Christopher (count 1) and found true firearm and great bodily injury allegations (§§ 12022.53, subd. (d), 12022.5, subd. (a)(1), 12022.7, subd. (a)) and assault with a deadly weapon (§ 245, subd. (a)(2)) on Christopher (count 2) and found true a firearm (§ 122022.5, subd. (a)(1)) and a great bodily injury allegation (12022.7, subd. (a)).

The jury found defendant not guilty of attempted murder of Harris (count 3), but guilty of the lesser offense of attempted manslaughter (§ 664/192, subd. (a)) and found true the same firearm and great bodily injury allegations as the assault on Christopher; the jury found defendant guilty of assault with a deadly weapon on Harris (count 4) and found true the same firearm and great bodily injury allegations. The jury found defendant not guilty of kidnapping Harris (count 5) and not guilty of the lesser offense of felony false imprisonment and could not reach a verdict on misdemeanor false imprisonment.

The trial court granted a motion for acquittal (§ 1118.1) on the kidnapping count relating to Cynthia (count 6). The jury found defendant guilty of inflicting corporal injury on Cynthia (§ 273.5; count 7) and false imprisonment (§ 236) of Cynthia (count 8)

---

**4** Further undesignated statutory references are to the Penal Code.

7

and found the firearm allegation true as to each count but could not reach a verdict on the great bodily injury allegations.

The jury found defendant guilty of carjacking (§ 215, subd. (a); count 9) with personal use of a firearm (§ 12022.53, subd. (b), and robbery (§ 211; count 10) with the same firearm allegation true. It found defendant guilty of making criminal threats (§ 422) against Fisher (count 11) and Regine (count 13) and found true the firearm allegation on each count. It found defendant guilty of assault with a deadly weapon as to Fisher (count 12) and Regine (count 14) and found the firearm allegations true as to both counts.

Finally, the jury found defendant guilty of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 15), vehicle theft (Veh. Code, § 10851; count 16), and violent resisting (§ 69; count 18) as to Officer Willet. The charge of violently resisting Officer Lander (count 17) was dismissed.

*The Sanity Trial*

Defendant initially pled not guilty and later added a plea of not guilty by reason of insanity (§ 1026). Pursuant to section 1027, the court appointed Doctors Charles Schaffer and Michael Kelly to examine defendant and investigate his mental status. They presented reports, reaching different conclusions as to whether defendant was legally insane at the time of the crimes. Kelly found defendant had been able to understand nature and quality of his acts and to distinguish right from wrong. Schaffer found defendant had lacked the capacity to distinguish right and wrong.

After the verdicts, defendant withdrew his plea of not guilty by reason of insanity as to all counts except counts 1 through 4, the shootings of Christopher and Harris. The parties stipulated the jury could consider the evidence from the guilt phase of the trial.

Dr. Schaffer testified for defendant. In his opinion, at the time of the two shootings defendant had the ability to understand the nature and quality of his acts but lacked the ability to distinguish right from wrong. Defendant thought he acted in self-defense. His paranoid thoughts contributed to the shootings; there was no rational reason

8

for them. Schaffer stressed that defendant had had a long-term, close relationship with both of his victims, and therefore shooting them on short notice without warning made no sense. He believed the shootings were the product of disturbed thinking and could not be explained as rational or provoked. Schaffer found Harris's statements that defendant thought people were out to get him significant in reaching this conclusion.

Schaffer noted that defendant had a prior similar episode in 2011 at Elmhurst hospital. Then defendant was diagnosed with psychotic disorder NOS, which would now be bipolar I, most recent episode manic with psychotic features in partial remission, his current diagnosis.

Schaffer explained that defendant fled after the shootings because he knew it was legally wrong, but he lacked the capacity to know it was morally wrong. Defendant's statement about going to jail showed he knew his actions were legally wrong. Schaffer testified defendant believed he was acting in self-defense and thought it was morally justified, but he acknowledged that defendant did not say he shot his victims "for fear of his safety being in jeopardy." Schaffer asked defendant his rationale for shooting Christopher. Defendant was uncertain; he said he may have shot Christopher because he believed the unpleasant events earlier in the day were Christopher's fault. Schaffer assumed defendant meant the shooting of Harris and abuse of Cynthia.[5] Also, defendant said Christopher had come over to his house several times before the shooting asking for help with his child and defendant found that annoying. Christopher reported he did not bother defendant about his child; he may asked for advice once when the child was sick, but he did not go over every day. Defendant never told Christopher he was a bother.

---

[5] Defendant may have been referring instead to the power going out several times; as we noted *ante* he had thought Christopher was "messing" with the power the day of the shootings. Christopher said he was on the phone with SMUD and headed to the meter when he was shot.

Schaffer had reviewed Dr. Kelly's report. Schaffer thought Kelly was very thorough in his interview. Kelly agreed with him as to the diagnosis, except for the psychotic features part. Schaffer felt that parts of Kelly's report supported his diagnosis of psychosis. For example, defendant told Kelly that preceding the offenses his eyes changed color and that he was contemplating scientific methods of accelerating particles and how this might apply to the design of UFO's. Schaffer conceded other portions of Kelly's report could support a finding that defendant was legally sane at the time of the shootings. After defendant shot Christopher, he told him, " 'Take your ass to the hospital. You'll be the fuck all right.' " Schaffer thought defendant was questioning what he had done, but understood others might interpret the statement as indicating defendant knew his action were morally wrong. Defendant's statement to Kelly that he regretted shooting Christopher could support a finding that defendant knew his action was morally wrong, but it might indicate only his awareness of that wrongness a year later. Today defendant knew his act was morally wrong.

Dr. Kelly testified for the People. He had considerably less experience than Schaffer; he was still in training at the time of the evaluation and this was his first sanity evaluation. The trial court accepted him as an expert and had appointed him to evaluate defendant. In Kelly's opinion, defendant was legally sane at the time of the shootings; he was able to understand the nature and quality of his action and to distinguish right from wrong.

Kelly found no evidence defendant had delusional thoughts. He explained that defendant's statements about his eyes changing color could reflect his perception that eye color changes depending on clothing and ambient lighting. Kelly did not think defendant had a visual hallucination, but simply misattributed a lot of significance to something he noticed. An inaccurate perception was not necessarily a delusion.

Kelly found defendant's version of events differed from those provided by witnesses; defendant painted himself in a more favorable light and consistently

10

minimized his conduct. Defendant said shooting Harris was an accident and he immediately regretted it. Defendant felt bad and did not feel threatened. Kelly believed defendant shot Christopher out of frustration. Defendant chased Christopher with a loaded shotgun and fired several times; he was not threatened and regretted his actions.

The jury found defendant legally sane at the time of the shootings.

## DISCUSSION

### I

### *Admission of Cynthia's Preliminary Hearing Testimony*

Cynthia testified at the preliminary hearing, but the prosecution could not find and serve her for trial. The People moved to deem Cynthia an unavailable witness and admit at trial her testimony at the preliminary hearing and evidence of Cynthia's prior inconsistent statements to medical personnel. On May 11, 2015, the trial court held a hearing on the People's due diligence. The trial court found due diligence and ruled Cynthia's preliminary hearing testimony was admissible. The court also ruled Cynthia's inconsistent statements to medical personnel were admissible, although it later ordered them stricken.[6]

Defendant contends the admission at trial of Cynthia's testimony at the preliminary hearing violated his right to confrontation. He contends the People failed to exercise due diligence to obtain her presence at trial. Instead, the People made only last minute efforts and failed to serve Cynthia when she appeared at the jail to visit defendant.

A. *The Law*

"A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. 1, § 15.) The right of confrontation 'seeks "to

---

[6] Defendant unsuccessfully moved for a mistrial. There is no issue on appeal as to these statements.

ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " [Citation.] To deny or significantly diminish this right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling "into question the ultimate ' "integrity of the fact-finding process." ' " [Citation.]' [Citation.]" (*People v. Herrera* (2010) 49 Cal.4th 613, 620-621 (*Herrera*).)

"Notwithstanding the importance of the confrontation right, it is not absolute. [Citation.] Traditionally, there has been 'an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination . . . .' [Citation.] Before the prosecution can introduce testimony from a prior judicial proceeding, however, it 'must . . . demonstrate the unavailability of' the witness. [Citation.] Generally, a witness is not unavailable for purposes of the right of confrontation 'unless the prosecutorial authorities have made a good-faith effort to obtain [the witness's] presence at trial.' [Citations.]" (*People v. Cromer* (2001) 24 Cal.4th 889, 897.)

In California, this traditional exception to the right of confrontation for prior recorded testimony is codified in Evidence Code section 1291, subdivision (a), which provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." A witness is unavailable if "[a]bsent from the hearing and the proponent of his or her statement has exercised

12

reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) "Reasonable diligence, often called 'due diligence' in case law, ' "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." ' [Citation.]" (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.)

In determining whether the People exercised reasonable diligence in procuring Cynthia's presence at trial, the factors we consider include " 'the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citation.]" (*Herrera, supra,* 49 Cal.4th at p. 622.) Courts have found reasonable diligence "when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period," but not where "the efforts of the prosecutor or defense counsel have been perfunctory or obviously negligent." (*People v. Bunyard* (2009) 45 Cal.4th 836, 856, 855.) Reasonable diligence does not require exhaustion of every possible means of investigation, only "reasonable efforts to locate the witness." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298 (*Cummings*).) "That additional efforts might have been made or other lines of inquiry pursued does not affect" the finding of reasonable diligence. (*Ibid.*)

"We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence [citation]." (*Herrera, supra,* 49 Cal.4th at p. 623.)

B. *Evidence at the Due Diligence Hearing*

Jeremias Barboza, a process server for the District Attorney's Office, testified he received a subpoena for Cynthia Lee on March 23, 2015. He ran her name through pertinent databases, including SMUD, EDD, DMV, and welfare, all of which confirmed the address on the subpoena. He attempted service there but the house was vacant. People outside the house told him the occupants had been evicted. Barboza's further

13

research revealed a second address, but when he went there the tenants, who had lived there two years, did not know Cynthia. The case was then continued and Barboza stopped his efforts. When Barboza learned the house on Oakmont was boarded up, he put that fact in the system. On April 16 he sent the prosecutor an e-mail requesting assistance locating Cynthia.

On April 29, 2015, Barboza received another subpoena for Cynthia and again ran all the pertinent databases, receiving the same address as before. He rechecked that address on Oakmont Street and discovered the apartment was being renovated. He obtained the name of the leasing agent and contacted him, but the agent had no information on Cynthia. Barboza called the phone number on the subpoena and was told it was a wrong number. On May 15, he rechecked the databases and learned no new information. He checked the main jail logs and learned that Cynthia had visited on May 5. He made no further attempt to contact Cynthia.

Steve Glen, an investigator with the District Attorney's Office, was given the task of finding Cynthia in late April 2015. He, too, checked the databases and he went to the address on Cynthia's driver's license. There he spoke with a woman named Carol Anderson, identified as a friend of Cynthia's, to whom, he knew, a process server had already spoken. Anderson said the process server had given her his card which she passed on to Cynthia's daughter to give to Cynthia. Glen checked Anderson's residence and Cynthia was not there.

Glen next went to Deaja's high school and spoke with her. Deaja said she was staying with a friend and did not know where Cynthia was. Glen asked Deaja to update her contact information with the school; when he checked later, she had not done so. Later he called a number for Cynthia and Deaja answered; she said she was getting on light rail and hung up.

14

On May 1, Glen entered comments into a county-wide system for law enforcement, asking for a call if anyone contacted Cynthia. He also left a subpoena at the jail.

Glen checked several residences where cars connected to Cynthia might be. He either drove by or had someone else drive by, but no one saw any of the vehicles. At one location residents told him they received mail for Cynthia, but they did not know her. He checked with the post office and Cynthia had no forwarding address. He spoke again with Carol Anderson who told him that if Cynthia did not want to be found, he would not find her. She had passed Glen's message on to Cynthia and there were no calls. Anderson said Cynthia did not want to testify because she thought the world of defendant, "that's her man."

Glen called area hospitals, but none listed Cynthia as a patient. Nor was she listed as a missing person. He checked Sacramento County In-Home Health Services (IHHS) to see if Cynthia was receiving payment for services. IHHS had no record of Cynthia currently receiving payment; her last services were provided December 31, 2014. Glen checked Facebook and could not locate Cynthia. He also checked a private database and found only the Oakmont address.

Glen received notice that Cynthia had made a jail visit on May 9. Glen asked jail personnel why he was not notified and received no answer. A deputy checked the file and Glen's note to call him was still there.

Gayla Denison was the security officer working the front counter at the main jail when Cynthia visited on May 9. She noticed the comment on the computer that Cynthia needed to be served and that Glen should be contacted. Cynthia, who may have read Denison's computer screen, told Denison she had talked to the district attorney about the subpoena and had it. Denison noted the comment on the screen did not indicate the subpoena was at the jail. She did not call Glen because it was a Saturday and she assumed the office would be closed.

15

The trial court took judicial notice that the trial was originally set for June 14, 2014, and continued several times. After defendant entered a plea of not guilty by reason of insanity, the trial date was vacated and there were multiple continuances. On April 23, 2015, trial was assigned to that department with the understanding that trial would begin with the hearing of in limine motions on April 30. It was also agreed voir dire would begin May 11.

In finding due diligence, the court noted that while Cynthia was protective of defendant at the preliminary hearing, there had been no issue over her appearing. The court found the leads were competently explored and the failure to serve Cynthia at the jail was the product of unclear communication and the jail security officer trusting what Cynthia had told her.

C. *Analysis*

Defendant contends the People failed to show due diligence in procuring Cynthia's presence at trial. He argues Cynthia was a very important witness because she was in the best position to describe the dramatic change in him. Simply because she appeared at the preliminary hearing did not mean she would appear at trial. Defendant contends the search was not begun timely, and the People wasted time checking the same databases over and over and continually being stonewalled by Cynthia's family.

We agree with the trial court's finding of due diligence. Nothing in the record indicates the prosecution should have suspected that Cynthia would not appear at trial. There is no obligation on the People "to keep 'periodic tabs' on every material witness in a criminal case." (*People v. Hovey* (1988) 44 Cal.3d 543, 564.) Glen explained the reason behind continually checking the same databases; people change addresses frequently. The efforts to find and serve Cynthia were not "too late," as defendant argues. After Barboza was unable to locate Cynthia, Glen became involved in the search at the end of April, more than 10 days before trial. Courts have upheld a trial court's finding of reasonable diligence where the witness search was begun shortly or even

16

during trial.  (*People v. Saucedo* (1995) 33 Cal.App.4th 1230, 1238 [subpoenas generated eight days before trial], disapproved on another point in *People v. Cromer, supra,* 24 Cal.4th at p. 901, fn. 3, and cases cited therein.)

Further, Glen made considerable efforts to find Cynthia.  In addition to checking databases and Cynthia's last known address several times, he followed up several leads as to cars that might be connected to Cynthia, checked hospitals, IHHS, Facebook, the post office; he put a comment in a law enforcement system and left word at the main jail to serve Cynthia and contact him.  He contacted Carol Anderson and Cynthia's daughter Deaja more than once.  Courts have found these types of efforts sufficient to constitute diligence.  *Cummings, supra,* 4 Cal.4th at p. 1297 [frequent stops at witness's last known residence over a one-week period, contacting neighbors, employer, and relatives]; *People v. Wise* (1994) 25 Cal.App.4th 339, 344 [checking several addresses where witness might be found, as well as local jail, hospital, and coroner].)  Despite these efforts, Cynthia was not found because, as Carol Anderson told Glen, she did not want to be found.  A witness's calculated effort to avoid service of process does not establish lack of diligence.  (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706-707 [numerous attempts to find witness defeated by witness's determined effort to avoid testifying].)

Defendant criticizes the People's failure to serve Cynthia when she visited the jail.  We agree with the trial court's assessment that this failure reflected "unclear communication."  Although more could have been done to serve Cynthia, the prosecution's reasonable efforts demonstrate due diligence.  The standard for due diligence is reasonableness, not perfection.  (*Cummings, supra*, 4 Cal.4th at p. 1298; *People v. Diaz, supra*, 95 Cal.App.4th at p. 706; *People v. Wise, supra*, 25 Cal.App.4th at p. 344.)

17

## II

### *Sufficiency of the Evidence of Resisting*

The jury found defendant guilty in count 18 of violating section 69, resisting Officer Willet. (RT 1424) Defendant contends there is insufficient evidence of resisting because Officer Lander used excessive force in shooting defendant, who was unarmed.

Section 69, subdivision (a) states: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year, or by both such fine and imprisonment." Section 69 describes two offenses, attempting to deter and actually resisting an officer. (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1530.)

Here the People relied on the resisting offense. To violate section 69 by resisting an officer "by the use of force or violence" requires "that the officer was acting lawfully at the time of the offense." (*People v. Smith* (2013) 57 Cal.4th 232, 241.) A person has a right to resist excessive force used in making an arrest. (*People v. Adams* (2009) 176 Cal.App.4th 946, 953.) "The reasonableness of a particular use of force is judged from the perspective of a reasonable officer on the scene, not by the 20/20 vision of hindsight. The inquiry is an objective one: Was the officer's action objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation? [Citation.]" (*In re Joseph F.* (2000) 85 Cal.App.4th 975, 989.)

The standard for judicial review of a criminal conviction challenged as lacking evidentiary support is well established: "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."

18

(*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  We accord due deference to the verdict and will not substitute our conclusions for those of the trier of fact.  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)  A conviction will not be reversed for insufficient evidence unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Defendant contends Lander's shooting was excessive force because defendant was unarmed, the videotape of the car theft at the market did not show any weapon, and defendant had his hands up when shot.  He adds that he did not grab at Willet's gun or even kick Willett, but merely "responded to the use of excessive force by waiving his arms and legs after he was down."

First and foremost, neither Lander nor Willet was aware of the first two facts.  The be-on-the-lookout report indicated the suspect may be armed and dangerous and may have been involved in a domestic violence incident involving a shooting.  There was no evidence the officers knew the contents of the surveillance video at the market.  As to the third point, the record does not support defendant's assertion that his hands were up as he jumped out of the car immediately before he was shot.  As we have discussed, the officers testified that defendant initially put his hands up while inside the truck but then put them down and bent forward and down as if retrieving something.  He then jumped out of the truck suddenly and ran toward them, and immediately was shot.  When asked at trial whether the video from the CHP car showed defendant's hands were up, Lander responded it was "very hard to see where his hands are" at the time he was shot.  We have reviewed the video and agree.  As defendant leaves the truck, his movements are sudden and exaggerated and his arms are swinging.  His right hand is initially hidden from view.  Lander shoots defendant almost immediately after he sprints from the truck toward the officers; it appears possible defendant's hands raise in response to the impact. It is difficult to determine at what precise point defendant's hands raise.

19

In assessing whether Lander used reasonable or excessive force, we must consider the circumstances as they appeared to the officer at the time. (*In re Joseph F, supra,* 85 Cal.App.4th at p. 989.) Further, as the United States Supreme Court has observed in the context of determining reasonable force: "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." (*Graham v. Connor* (1989) 490 U.S. 386, 396-397 [104 L.Ed.2d 443].) Here, the officers were confronted with a suspect who they had reason to believe was armed and dangerous and had engaged in violence and shootings that day. Defendant had fled at very high rates of speed before stopping. After being ordered to put his hands up, defendant first complied but then appeared to rummage in the seat next to him and bolted unexpectedly from the car towards the officers. At that point, it was reasonable to believe defendant had obtained a weapon and intended to do harm to the one or more of the officers. Substantial evidence supports the jury's finding that Officer Lander was acting lawfully and did not use excessive force.

Our review of the video similarly supports Willet's testimony regarding defendant's actions when resisting. It shows defendant on the ground, after being very still for multiple minutes as the officers gather around him, pat him down, and administer first aid, suddenly lurching upward and appearing to grab at Willet's right side, almost touching Willet's holstered gun as Willet attempts to step away. Defendant almost simultaneously violently kicks Willet and rolls off-screen. Substantial evidence supports the conviction for violating section 69.

III

*Section 654 and Count 8*

The jury found defendant guilty in count 7 of domestic violence with a firearm enhancement and in count 8 of false imprisonment with the same enhancement. The defense argued the sentence on count 8 should be stayed pursuant to section 654. The

20

trial court disagreed, finding that defendant had a separate intent to keep Cynthia from leaving to support the false imprisonment count. The court sentenced defendant on count 7 to one year plus one year four months on the enhancement and on count 8 to a consecutive unstayed term of eight months plus one year four months for the enhancement.

Defendant contends the trial court violated section 654 by not staying the sentence on count 8. He contends both the domestic violence and the false imprisonment were part of an indivisible course of conduct with a single intent and objective. He notes the coextensive timing of the two crimes.

Section 654 provides in part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"Case law has expanded the meaning of section 654 to apply to more than one criminal act when there is a course of conduct that violates more than one statute but nevertheless constitutes an indivisible transaction. [Citation.]" (*People v. Hairston* (2009) 174 Cal.App.4th 231, 240.) " 'If all of the offenses are incident to one objective, the court may punish the defendant for any one of the offenses, but not more than one. [Citation.] If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.]' [Citations.]" (*Ibid.*) "[T]he purpose of section 654 is to ensure that a defendant's punishment will be commensurate with his culpability. [Citations.]" (*People v. Correa* (2012) 54 Cal.4th 331, 341.)

A trial court "is vested with broad latitude" in making the factual determination whether section 654 applies. (*People v. Vang* (2010) 184 Cal.App.4th 912, 915-916.) "A

21

trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence. [Citation.]" (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

That the false imprisonment was coextensive with the brutal assault on Cynthia is not dispositive of the section 654 issue because "[i]t is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) As the trial court noted, defendant did not need to tie Cynthia up to assault her, so the false imprisonment was not merely incidental to the domestic violence.

The record supports the trial court's determination that defendant had separate objectives and intents in committing the domestic violence and the false imprisonment offenses. Defendant's intent in the domestic violence was to inflict corporal punishment on Cynthia; he did so by hitting and kicking her, banging her head on the floor, choking her until she lost consciousness, and burning her with a cigarette. The length and breadth of the assault shows an intent to inflict pain. His intent in the false imprisonment was to keep Cynthia from leaving, demonstrating his dominance and control. Cynthia testified, "[H]e basically overpowers me." Defendant displayed this separate intent to show dominance by forcing Harris to tie Cynthia up, thereby physically restraining her.

The trial court did not violate section 654 in failing to stay the sentence on count 8.

IV

*Section 654 and Count 15*

Defendant contends the trial court erred in failing to stay the sentence on count 15, felon in possession of a firearm.[7] He argues the People failed to prove he possessed the firearm with an intent separate from the intent to commit the offenses in which he used a gun. We find no error.

The crime of being a felon in possession of a firearm "is committed the instant the felon in any way has a firearm within his control." (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1410, italics omitted (*Ratcliff*).) "Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense.' [Citation.]" (*People v. Bradford* (1976) 17 Cal.3d 8, 22.) "[I]f the evidence demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense, section 654 will bar a separate punishment for the possession of the weapon by an ex-felon." (*Ratcliff,* at p. 1412.) But where the "defendant's possession of the weapon was not merely simultaneous with" his crimes, "but continued before, during and after those crimes," section 654 does not prohibit separate punishments. (*Id.* at p. 1413.)

Here the evidence shows that defendant possessed the gun prior to pointing it at Harris and ordering her to tie up Cynthia. Defendant retrieved the gun from Deaja's room. Although there is no evidence as to how the gun got there, the reasonable

---

[7] Defendant was charged with possession of both the shotgun he used and a rifle which was in the living room. The jury instructions limited the offense of conviction to possession of the shotgun.

23

inference is that defendant put it there and he had control over it. Deaja was his minor daughter and her room was the only bedroom in the small apartment. Defendant went straight to the gun when he wanted to use it, indicating he knew where the gun was. That Harris had not seen the gun before is immaterial as she had not lived with defendant since the previous November. Defendant kept the gun with him until he stopped in Concord and let Harris and Cynthia out. This is not a case like *People v. Bradford, supra,* 17 Cal.3d at page 13, where defendant wrestled the gun away from the officer just before firing, or like *People v. Venegas* (1970) 10 Cal.App.3d 814, 818-821, where there was no evidence the defendant possessed the gun prior to the shooting and the defense presented evidence that defendant obtained the gun during a struggle moments before the shooting. Here no "fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense." (*Ratcliff, supra,* 223 Cal.App.3d at p. 1412.) The trial court correctly declined to stay sentence.

V

*Sufficiency of the Evidence of Legal Sanity*

Defendant contends there is insufficient evidence to sustain the jury's finding that he was legally sane at the time he shot Cynthia and Christopher. He contends that due to his mental illness he lacked the ability to know the shootings were morally wrong.

Citing *People v. Drew* (1978) 22 Cal.3d 333, 351 and *People v. Skinner* (1986) 185 Cal.App.3d 1050, 1059, defendant contends the question on appeal is whether the jury could reasonably reject the evidence of defendant's insanity. Defendant contends the jury could not reasonably reject Dr. Schaffer's testimony and opinion because he was more experienced than Dr. Kelly. Further, his opinion that defendant suffered a psychotic episode was based on (1) defendant's prior psychotic episode in New York at Elmhurst Hospital; (2) Harris's statements that defendant thought someone was out to get him, believed that Cynthia was "lost," was not making sense, and was acting strangely; (3) defendant's refusal to take Harris to hospital nearby; and (4) the lack of any reason to

24

shoot Christopher without warning. In contrast, defendant argues, Kelly was inexperienced, relied only on defendant's interview statements in reaching his opinion, and failed to examine the circumstances of the day of the shootings. Defendant ridicules Kelly for failing to find the following symptoms delusions: defendant's claim he was thinking faster than anyone else, his belief his eyes changed color, believing he could use particle acceleration to create UFO's, and finding a call on a stranger's phone to be a supernatural sign.[8]

We have already set forth the standard for reviewing a claim of insufficient evidence in Part II, *ante*. Applying the correct standard, Dr. Kelly's testimony and opinion provided credible and sufficient evidence for the jury to find defendant sane.

This is not a case like *Drew* or *Skinner* where the prosecution offered *no* evidence of sanity. Although Kelly was less experienced than Schaffer, the trial court found Kelly qualified as an expert and defendant did not challenge that finding. The difference in the experience of the two experts was a factor for the jury to consider. Kelly met with defendant for seven hours and cited defendant's statements extensively in his report, but he denied he relied exclusively on those statements in reaching his opinions. Kelly reviewed the police reports, the CHP video, the audiotape of defendant at Kaiser Hospital, the transcript of the preliminary hearing, 40 minute conservations with Cynthia and Harris, defendant's medical records, Christopher's statements, and the medical records from Elmhurst Hospital. As to the symptoms Schaffer thought were delusions, Kelly considered them paranoia or misattributing significance to an observation. He explained, "Delusion is a fixed, false belief that someone holds despite evidence to the

_____

[8] Defendant told Kelly there were a number of unusual coincidences the week before the offenses. For example, defendant claimed an acquaintance on the street said hello and told him his wife was on the phone, handing defendant a cell phone. Defendant thought these coincidences were meaningful and said "yes" when Kelly asked if they seemed supernatural.

contrary.  So an inaccurate perception of people is not necessarily a delusion."  He testified to the recognized difficulty in distinguishing between a delusion and a firmly held belief.  Kelly testified he did not have enough information to determine whether defendant was delusional in New York.

Further, Schaffer recognized the existence of information that challenged his opinion.  He acknowledged that defendant's statement to Kelly that he regretted shooting Christopher and his statement to Christopher at the time of shooting--"Take your ass to the hospital.  You'll be the fuck all right."--could be interpreted as showing that defendant knew his actions were morally wrong, although Schaffer did not interpret them that way.  Schaffer also testified it was possible that defendant was suffering from disturbed behavior but still knew the shootings were morally or legally wrong.

Sufficient evidence supports the jury's finding of sanity.

VI

*Correction of Abstract*

Defendant requests a correction of the abstract of judgment as to count 12, the assault on Fisher.  The trial court imposed a sentence of one year, one-third the mid-term, and stayed it pursuant to section 654.  The abstract, however, shows a stayed term of one year and four months.  The People agree the error should be corrected, as do we.

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls. [Citations.]" (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)  " 'If the judgment entered in the minutes fails to reflect the judgment pronounced by the court, the error is clerical, and the record can be corrected at any time to make it reflect the true facts.' [Citation.]" (*People v. Rowland* (1988) 206 Cal.App.3d 119, 123.)  We shall direct the trial court to correct the abstract.

26

## DISPOSITION

The judgment is affirmed.  The trial court shall prepare a corrected abstract of judgment to show the one-year stayed sentence on count 12 and to forward a certified copy to the Department of Corrections and Rehabilitation.

      /s/

Duarte, Acting P. J.

We concur:

      /s/

Hoch, J.

      /s/

Renner, J.